UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
RABBI JACOB JOSEPH SCHOOL,                    :
                                              :
                       Plaintiff,             :
                                              :             **MEMORANDUM AND ORDER**
          -against-                           :             11-cv-05801 (DLI) (VVP)
                                              :
ALLIED IRISH BANKS, P.L.C.,                   :
                                              :
                       Defendant.             :
                                              :
------------------------------------------------------------ x

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiff Rabbi Jacob Joseph School ("RJJ") filed the instant action against defendant Allied Irish Banks, p.l.c. ("AIB"), asserting violations of English Law arising out of the purchase of a subordinated debt issued by AIB. AIB moves to dismiss the complaint pursuant to the doctrines of *forum non conveniens* and international comity. RJJ opposes the motion. For the reasons set forth below, AIB's motion to dismiss is granted.

## BACKGROUND

RJJ is a religious school operating in Staten Island, New York. (Compl., Dkt. Entry 1-2, ¶ 1). AIB is a bank organized under the laws of Ireland. (Compl. ¶ 2; Decl. of Bryan Sheridan, Dkt. Entry 8 ("Sheridan Decl."), at ¶ 2).

In March 2010, AIB issued interesting bearing bonds with a nominal value of $177,096,000 (the "Notes"). (Compl. ¶ 5). The Notes were issued pursuant to an exchange offer, where AIB offered to exchange the Notes for bonds that it previously had issued in 2004 ("2004 Notes"). (Sheridan Decl. ¶ 6.) According to the Exchange Offer Memorandum issued in connection with the exchange, to participate in the exchange, each holder of the 2004 Notes had to represent that it was not a United States person or acting on behalf of a United States person.

1

(*Id.* Ex. 5, at 6-7.)  The paying agents for the Notes were located in England, France, Luxembourg and Ireland.  (*Id.* Ex. 6 at 6.)  The Notes' terms were governed by English law, except that certain provisions relating to any wind-up of AIB were governed by Irish law.  (*Id.* Ex. 7 at 28.)  AIB also submitted itself to the jurisdiction of English courts for any disputes in connection with the Notes, and waived any argument that it would be an inconvenient forum.  (*Id.*)  The Notes were listed on the Irish Stock Exchange and any buyer of the Notes on the secondary market would have been required to purchase the Notes through clearing systems located in Belgium and Luxembourg.  (*Id.* ¶ 11.)  There were no procedures to settle and clear trades of the Notes in the United States.  (*Id.*)

On or about November 16, 2010, RJJ purchased Notes with a face value of $600,000 on the secondary market through a third party broker.  (Compl. ¶ 6; Decl. of Marvin Schick, Dkt. Entry 12 ("Schick Decl."), at ¶ 3).  By late 2010, the financial crisis and the sovereign debt crisis in Europe left AIB and the Irish government facing worsening financial conditions, and they were in need of capital.  (Sheridan Decl. ¶ 3.)  To stabilize the Irish financial system, on November 28, 2010, the Irish government agreed to accept financial support from the European Union ("EU") and the International Monetary Fund ("IMF"), a portion of which was earmarked to provide capital to Irish banks, including AIB.  (*Id.*)

On December 23, 2010, pursuant to the bailout from the EU and the IMF, as well as the subsequent domestic implementing legislation in Ireland, the Credit Institutions (Stabilisation) Act 2010 ("Act"), Ireland's High Court ordered AIB to issue billions of dollars of equity to a fund operated by the Irish government, effectively nationalizing the bank and injecting the bank with fresh capital.  (*Id.* ¶ 4.)  By July 2011, the Irish government had a 99.8% ownership interest in AIB.  (*Id.*)

On April 14, 2011, pursuant to the Act, Ireland's High Court issued a Subordinated Liability Order ("SLO") amending the terms of AIB's subordinated debt, including the Notes. (*Id.* ¶ 12.) The Irish Minister for Finance announced that the SLO was intended to ensure that AIB's subordinated debt holders shared the burden of AIB's struggles and to reduce the amount of capital needed from Irish taxpayers. (*Id.* ¶ 12.)

Following the SLO, in May 2011, AIB announced its "intention to launch an offer to purchase for cash and a solicitation of consents" with respect to a number of outstanding securities, including the Notes (the "Offer/Solicitation"). (Compl. ¶ 7). In the Offer/Solicitation, AIB announced that it would repurchase the Notes at a discount of 25 cents per dollar of the Notes' face value, and, if any of the holders of the Notes did not accept this offer, it would cause the holders to consider an "Extraordinary Resolution" giving AIB the option to repurchase all of the Notes at a price of one cent for every $ 1,000 of the Notes' face value. (*Id*.) In other words, the Notes' investors were forced to accept 25 cents on the dollar, because otherwise the Notes essentially would be worthless. (*Id.* ¶ 9.) The Irish Minister for Finance explained that the Solicitation/Offer was made to ensure that AIB had the required capital and that holders of subordinated debt, such as the Notes, shared the burden with equity holders. (Sheridan Decl. ¶ 14.) On June 16, 2011, the Noteholders passed the Extraordinary Resolution at a meeting in London. (*Id.* ¶ 15; Compl. ¶ 8.)

RJJ did not sell its share of the Notes pursuant to the Offer/Solicitation. (Compl. ¶ 10.) Accordingly, following passage of the Extraordinary Resolution, AIB purported to purchase RJJ's Notes at a price of one cent for every $1,000 of the Notes' face value, which totaled six dollars. (*Id.* ¶ 11.)

RJJ brought this action challenging the validity of the Extraordinary Resolution. RJJ contends that, under English Law, AIB's purchase through the Extraordinary Resolution was: 1) invalid and ultra vires, as it allegedly is not within the power of AIB to amend the terms of the Notes; and 2) exercised in bad faith and was "oppressive and discriminatory" to the Noteholders who did not accept the Offer/Solicitation. (*Id.* ¶ 13). RJJ seeks a declaration that the Extraordinary Resolution was invalid and that it remains the holder of their Notes. (*Id.* ¶¶ 16-17.) RJJ also seeks damages. (*Id.* ¶¶ 18-19.)

AIB moved to dismiss the Complaint on *forum non conveniens* grounds. (*See* Mem. of Law in Supp. of Def.'s Mot. to Dismiss Compl., Dkt. Entry 6 ("AIB Mem.").)[1] AIB asserts that the deference to RJJ's choice of forum is overcome here because there is an adequate alternative forum, and all the public and private factors weigh in favor of dismissal. (*See id.* 7-18.) RJJ opposed the motion, asserting that the court has a strong interest in adjudicating the rights of a plaintiff located in this district and that it is not an inconvenient forum. (*See* Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss, Dkt Entry 13 ("RJJ Opp'n"), 1-10.) RJJ also contends that AIB's motion is barred by the terms of the Trust Deed governing the rights and obligations of the Noteholders. (*Id.* 11-12.) For the reasons set forth below, AIB's motion is granted on *forum non conveniens* grounds and the action is dismissed.

## DISCUSSION

**I.     Legal Standard – *Forum Non Conveniens***

"The doctrine of *forum non conveniens* allows a district court to dismiss a case where the preferred venue is a foreign tribunal." *Overseas Media, Inc. v. Skvortsov,* 441 F. Supp. 2d 610,

---

[1] AIB also moved to dismiss under the principle of international comity. The court does not address this argument because it is dismissing the action on *forum non conveniens* grounds.

4

614 (S.D.N.Y. 2006), *aff'd*, 277 F. App'x. 92 (2d Cir. 2008). The Second Circuit has applied a three-step test to determine whether or not dismissal should be granted on these grounds:

> At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum. At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. Finally, at step three, a court balances the private and public interests implicated in the choice of forum.

*Norex Petroleum Ltd. v. Access Indus. Inc.,* 416 F. 3d 146, 153 (2d Cir. 2005) (citing *Iragorri v. United Tech. Corp.*, 274 F. 3d 65, 73-74 (2d Cir. 2001)). Ultimately, it is the defendant who "has the burden to establish that an adequate alternative forum exists and then to show that the pertinent factors 'tilt strongly in favor of trial in the foreign forum.'" *Wiwa v. Royal Dutch Petroleum Co.*, 226 F. 3d 88, 100 (2d Cir. 2000) (quoting *R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F. 2d 164, 167 (2d Cir. 1991) (alteration omitted)). The decision to dismiss a case on *forum non conveniens* grounds rests in the sound discretion of the court. *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F. 3d 64, 70 (2d Cir. 2003).

## II.     Deference to Plaintiff's Choice of Forum

It is well settled that a plaintiff's choice of forum is given deference such that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947). Courts must give deference to United States residents' choice of forum "not because of chauvinism or bias in favor of United States residents. It is rather because the greater the plaintiff's ties to the plaintiff's chosen forum, the more likely it is that the plaintiff would be inconvenienced by a requirement to bring the claim in a foreign jurisdiction." *Wiwa*, 226 F. 3d at 102. "Notwithstanding the deference, 'dismissal should not be automatically barred when a plaintiff has filed suit in his home forum. As always, if the balance of conveniences suggests that trial in the chosen forum would be

5

unnecessarily burdensome for the defendant or the court, dismissal is proper.'" *Iragorri*, 274 F. 3d at 71 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 n.23 (1981)); *see also Scottish Air Int'l., Inc. v. British Caledonian Grp., PLC*, 81 F. 3d 1224, 1232 (2d Cir. 1996) ("under certain circumstances an American plaintiff may be required to litigate abroad").

The precise degree of this deference "depends on the specific facts of the case and may be viewed as operating along a 'sliding scale.'" *Pollux Holding Ltd.*, 329 F. 3d at 71. When, "a plaintiff sues in his home forum, that choice is generally entitled to great deference, because it is presumed to be convenient." *Id.* (citation omitted). However, "[w]here an American plaintiff chooses to invest in a foreign country and then complains of fraudulent acts occurring primarily in that country, the plaintiff's ability to rely upon citizenship as a talisman against forum non conveniens dismissal is diminished." *Sussman v. Bank of Israel*, 801 F. Supp. 1068, 1073 (S.D.N.Y. 1992), *aff'd*, 990 F. 2d 71 (2d Cir. 1993) (per curiam); *see also Zweig v. Nat'l Mortg. Bank of Greece*, 1993 WL 227663, at *5 (S.D.N.Y. June 21, 1993) ("[T]he plaintiff's forum choice is accorded less deference given that all other real parties in interest in this litigation are foreign.").

Here, RJJ is located in Staten Island, New York. (Compl. ¶ 1.) Thus, it has brought suit in its home forum, and it can be assumed easily that this forum is convenient for RJJ. Thus, its choice of forum is entitled to considerable deference. However, that deference is somewhat diminished because RJJ chose to invest in a foreign bank's debt that was not listed on any domestic exchange and had to be purchased through clearing systems located in Europe. (*See* Sheridan Decl. ¶ 11.) In any event, the court must look to see if the other factors in its *forum non conveniens* analysis tilt strongly in favor of dismissal before disturbing RJJ's choice of its home forum.

### III. Adequate Alternative Forum

AIB asserts that England is an adequate alternative forum in which to litigate this matter, because, under the terms of the Notes, AIB has already consented to jurisdiction there. (AIB Mem. 10-12.) RJJ concedes that English courts provide a fair alternative forum, but contends English courts are not adequate in this instance because RJJ lacks the resources to litigate in a foreign country. (*See* RJJ Opp'n 6-7.)

An alternative forum is adequate if: 1) the defendants are amenable to service of process there; and 2) if that forum permits the litigation of the subject matter of the dispute. *Pollux Holding Ltd.*, 329 F. 3d at 75. There is no dispute that AIB is amenable to service of process in England by virtue of the Trust Deed and Prospectus to the Notes, which states, "[AIB] irrevocably submits to the jurisdiction of the courts of England" for any disputes arising out of the Notes. (Sheridan Decl. ¶ 10, Ex 2 at 55, Ex. 7 at 28.) There is also no question that English courts would hear this dispute. RJJ brings its claims under English law and, as the Second Circuit has acknowledged in expressing "high regard" for English courts, "there can be no doubt that England permits litigation to resolve commercial disputes" brought under English law. *Pollux Holding Ltd.*, 329 F. 3d at 75.

RJJ argues that England is not an adequate alternative forum in this instance because it is a religious school that purportedly lacks the resources to litigate its claims in England. (*See* RJJ Opp'n 6-7.) This is not a valid consideration for purposes of the adequate alternative forum prong of the court's analysis. The Second Circuit has held that while financial hardship may be considered under the interest balancing prong of *forum non conveniens*, it "may not be considered in determining the *availability* of an alternative forum." *Murray v. British Broad. Corp.,* 81 F. 3d 287, 292-93 (2d Cir. 1996) (emphasis in original). Therefore, there is an

adequate alternative forum if this action is dismissed, and the court must turn to the public and private interests implicated here.

## IV.     Balancing Public and Private Interests

### A.     Public Interests

AIB argues that that the public interests weigh in favor of dismissal because English law governs this dispute and this case has a stronger connection to England than New York. (AIB Mem. 13.) RJJ acknowledges that there are links between this case and England, but contends that there is a strong connection with the United States as well because RJJ purchased the Notes through a broker in the United States. (*See* RJJ Opp'n 10.) RJJ also asserts that the United States has a strong public interest in protecting the interests of its investors. (*Id.*)

In evaluating the public interest factors the Supreme Court explained:

> Factors of public interest also have place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

*Gilbert*, 330 U.S. at 508-09.

The parties do not dispute that RJJ's claims are governed by English law under the terms of the Notes. (*See* Sheridan Decl. Ex. 7 at 28; Compl. ¶ 12.) RJJ's claims are premised on its allegation that AIB's purported purchase of the RJJ bonds was invalid because the Extraordinary Resolution was ultra vires and an abuse of the Noteholders' power of modification pursuant to

8

English law. (Compl. ¶ 13.) While not dispositive,[2] this weighs in favor of dismissal, as English courts certainly are better equipped to apply English law, and have an interest in regulating investment activities occurring under its laws. *See Pollux Holding Ltd.*, 329 F. 3d at 76 (Affirming district court's holding that application of English law "strongly tipped in favor of litigation in England."); *Van Bourgondien-Langeveld v. Van Bourgondien*, 2010 WL 5464890, at *7 (E.D.N.Y. Dec. 29, 2010) ("[H]aving a Dutch court apply Dutch law to this dispute mitigates in favor of dismissal.") *VictoriaTea.com, Inc. v. Cott Beverages, Canada*, 239 F. Supp. 2d 377, 387 (S.D.N.Y. 2003) ("An action should be tried in a forum familiar with the law governing the case."); *First Union Nat'l Bank v. Paribas*, 135 F. Supp. 2d 443, 453 (S.D.N.Y. 2001) (Finding that application of English law "cuts to some degree" in favor of dismissal), *aff'd sub nom. First Union Nat'l Bank v. Arab African Int'l. Bank*, 48 F. App'x 801 (2d Cir. 2002); *Zweig v. National Mortg. Bank of Greece*, 1993 WL 227663, at *6 (S.D.N.Y. June 21, 1993) ("The Republic of Greece has a strong public interest in adjudicating disputes concerning commercial transactions issued pursuant to its statutes").

Moreover, where the transaction at issue took place entirely overseas, the public interest is served by dismissing the action. *See Pollux Holding Ltd.*, 329 F. 3d at 76 (district court did not abuse its discretion dismissing claim in favor of England where "the alleged fraud and misrepresentations primarily occurred there, and that plaintiffs' allegations of breach of contract

---

[2] The court recognizes that, while acknowledging that the application of English law indicated "some preference for England" as a forum, the Second Circuit has held that it is not burdensome for district courts to apply English law. *Gross v. British Broad. Corp.*, 386 F. 3d 224, 233-34 (2d Cir. 2004). However, in *Gross*, the district court found that the convenience of the witnesses only slightly favored England and did not find that the transaction had a much stronger connection to England than New York. *See id* at 232-34. As discussed further below, here the transaction was centered entirely in Europe and has only an incidental connection to this jurisdiction. Thus, while the application of English law alone is not enough to overcome deference to RJJ's choice of forum, it is another factor tipping the scales against this forum.

9

and breach of fiduciary duty arise out of contracts entered into in London."); *Alfadda v. Fenn*, 159 F. 3d 41, 46 (2d Cir. 1998) (Local jurors should not be burdened by hearing "a challenge to a bank restructuring ordered and supervised by French banking authorities."); *Van Bourgondien-Langeveld*, 2010 WL 5464890, at *7 ("The Netherlands has a 'stronger local interest' in the dispute because the Note was signed there and performance under it also occurred in the Netherlands"); *VictoriaTea.com, Inc.*, 239 F. Supp. 2d at 387 (dismissal appropriate where agreement at issue "was negotiated and executed in Canada . . . manufacturing and shipment of the Product were carried out predominantly in Canada and the alleged breach of contract occurred there."). Here, the transactions at issue have a strong connection to England and little connection to the United States. The dispute relates to Notes issued by a foreign bank under English law. The central event at issue in this case, the Noteholder meeting approving the Extraordinary Resolution, took place in London. (*See* Sheridan Decl. ¶ 15.) If this action were to go to trial, local jurors thus would be tasked unnecessarily with reviewing the propriety of this English Noteholders' meeting that was part of a wider plan to stabilize the Irish banking system that was battered by the ongoing European debt crisis. *Reers v. Deutsche Bahn AG*, 320 F. Supp. 2d 140, 160 (S.D.N.Y. 2004) ("[T]o ask residents of the Southern District of New York to hear what would clearly be a lengthy and complex trial, involving Connecticut residents harmed by activities that occurred entirely in Europe, would be a significant burden.").

By contrast, the transaction has only an incidental connection with New York. While RJJ used a domestic broker to purchase the Notes (*see* Schick Decl. ¶ 3), the Notes' governing documents provide, and RJJ does not dispute, that the Notes had to be purchased through clearing houses located in Europe. (Sheridan Decl. ¶ 11.) Moreover, there was no procedure to settle the Notes in the United States and the Notes' offering materials made clear that they were

not being offered for sale in the United States, or registered pursuant to United States securities laws. (*Id.* ¶ 7, Ex. 5 at 6-7.) The only reason there is any connection between the Notes and this district is because RJJ, either on its own or through its broker, proactively decided to make a European investment that was not directed at United States investors. While the court certainly has an interest in protecting domestic investors, the court finds that this interest is diminished significantly here because RJJ decided independently to enter into a European transaction pursuant to the laws of England.

Thus, in light of the application of English law, the strong connection between the transactions at issue and England and the minimal connection between the Notes and this jurisdiction, the court finds that the public interest weighs heavily in favor of dismissal. *Murray*, 81 F. 3d at 293-94 ("[T]he connection of this case to the United States is as tenuous as its connection to the United Kingdom is strong. We therefore hold that the district court did not abuse its discretion in finding that the public interest factors militated in favor of dismissal.").

**B.     Private Interests**

AIB asserts that the private interests also weigh in favor of adjudicating this dispute in England because the evidence and witnesses relating to the Extraordinary Resolution are located in England and Ireland. (*See* AIB Mem. 14-18.) RJJ responds that AIB has control over the evidence and witnesses located abroad and, therefore, can produce them easily in this country. (*See* RJJ Opp'n 7-9.) RJJ reiterates that it does not have the financial resources to litigate this action in England, while AIB could easily defend against RJJ's claims in the United States. (*See id.* 9.)

In weighing the private interests, courts consider: "(1) the relative ease of access to sources of proof, (2) availability of compulsory process for attendance of unwilling witnesses,

11

and the cost of obtaining attendance of willing witnesses, and (3) all other practical problems that make trial of a case easy, expeditious and inexpensive." *Pollux Holding Ltd.*, 329 F. 3d at 75 (*citing Gilbert*, 330 U.S. at 508).  These factors weigh heavily in favor of dismissal in this case.

While the court "is mindful that with the current level of technology available to international companies . . . the costs of transporting documents are not as prohibitive as they once were[,] . . . where, as here, the majority of relevant evidence is located abroad, the burden imposed on the parties is still significant and favors dismissal." *Online Payment Solutions Inc. v. Svenska Handelsbanken AB*, 638 F. Supp. 2d 375, 388 (S.D.N.Y. 2009).  As the Second Circuit held in another matter where most of the witnesses and documentary evidence were located in England, "conducting trial in the United States might impose significant burdens on the parties." *Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC*, 155 F. 3d 603, 611 (2d Cir. 1998). For example, "[a]ny non-party witnesses who chose not to be deposed or to appear voluntarily at trial would be beyond the reach of the Court's compulsory authority.  As the Supreme Court has recognized: '[t]o fix the place of trial at a point where litigants cannot compel personal attendance [of witnesses] and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury or most litigants.'" *VictoriaTea.com, Inc.*, 239 F. Supp. 2d at 384 (quoting *Gilbert*, 330 U.S. at 511).  Even where, as RJJ asserts is the case here, witnesses are "within defendants' control, and could likely be produced for trial in this District voluntarily, courts are nevertheless instructed to weigh the costs of producing those witnesses." *Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474, 488 (S.D.N.Y. 2006), *aff'd*, 233 F. App'x. 83 (2d Cir. 2007).

Virtually all of the evidence and witnesses are located abroad, which RJJ does not dispute.  As discussed *supra* at § IV.A, the central events alleged in the Complaint occurred in

12

England and Ireland. RJJ's claims revolve around the amendment process to the Notes' terms and the passage of the Extraordinary Resolution. This process included the EU and IMF assisted bailout of Irish banks, the subsequent legislation enacted by the Irish government effectively nationalizing AIB, the Irish government's policy of sharing the taxpayers' burden from the bailout with the Noteholders, the Irish High Court's SLO that amended the terms of the Notes, the Offer/Solicitation by AIB to purchase the Notes for 25 cents on the dollar, and the Noteholders' meeting in London where the Extraordinary Resolution was passed allegedly rendering the Notes worthless. The parties likely will need to gather evidence relating to all of the above events in order to establish (or counter) allegations that AIB's actions were ultra vires and in bad faith in violation of English law. As none of these events occurred in the United States, the court is led to the inexorable conclusion that none of the evidence relating to these events is located in this country. (*See* Sheridan Decl. ¶ 16.) Thus, the court finds that, based upon the location of the evidence and the witnesses, litigating this case in New York would be much more burdensome than litigating this action in England, where the court has easier access to proof and can compel witnesses' testimony. (*See* Decl. of Timothy Jean-Paul Howe QC, Dkt. Entry 7 ("Howe Decl."), at ¶¶ 6-29, 39-42.)

The court understands that the parties can obtain evidence from third parties abroad through the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Convention") or letters rogatory. However, even assuming the English and Irish authorities comply with these requests, these tools only slightly ameliorate the burden on the parties. Courts in the Second Circuit have widely recognized that obtaining evidence through the Hague Convention and letters rogatory are cumbersome and inefficient, and hardly make litigation in the United States convenient. *See Scottish Air Int'l., Inc.*, 81 F. 3d at 1233

13

("Plaintiffs also point out that any witnesses located outside the district court's jurisdiction can be deposed if they will not appear voluntarily. Even if this is true, it still was not error for the trial court to find that obtaining testimony would be inconvenient for the parties."); *Online Payment Solutions Inc.*, 638 F. Supp. 2d at 391 n.8 ("[W]hile the Court appreciates the value of letters rogatory, the costs associated with bringing the bulk of the documents and testimony to this Court are excessive and unnecessary as compared to the costs and burdens of using such evidence in the courts of Sweden or England."); *Crosstown Songs U.K. Ltd. v. Spirit Music Grp., Inc.*, 513 F. Supp. 2d 13, 17 (S.D.N.Y. 2007) ("If this suit is not dismissed, [defendant] will have to engage in the time-consuming and expensive process of obtaining essential documentary evidence and witness testimony under the Hague Convention."); *Gilstrap*, 443 F. Supp. 2d at 488 ("While deposition testimony from foreign witnesses could likely be obtained through the use of letters rogatory and thereafter presented at trial, such a process has been recognized as time-consuming, and there is, of course, a preference for live testimony.").

This "massive inefficiency and inconvenience that [using the Hague Convention] would create for defendants and plaintiffs is all the more striking given the existence of an alternative forum where many of these problems would not arise." *Reers*, 320 F. Supp. 2d at 162. In England, unlike here, the parties can obtain documents and compel testimony easily from both England and Ireland. (*See* Howe Decl. ¶¶ 6-29, 39-42.)

The only private interest that arguably favors keeping the case in this district is RJJ's assertion that it lacks the resources to litigate in England. (*See* Schick Decl. ¶ 5.) While RJJ's practical ability to litigate in England is a valid consideration, in this instance it provides little help to RJJ. To support its claim that it lacks the resources to prosecute this action in England, RJJ provides a largely conclusory statement from RJJ's President that RJJ "does not have the

14

financial resources necessary to file and maintain a litigation in England" because "RJJ subsists on tuition payments and donations, and virtually all of our revenues are used for the operation of the School." (*Id.*)  This assertion is difficult for the court to evaluate because it lacks basic detail about, for example, the size of its revenues and the anticipated costs of litigating in England. Moreover, RJJ's poverty plea is undermined by its allegations that it was investing in $600,000 worth of Notes issued by an Irish bank through European dealers.  RJJ's relative wealth and sophistication sets it apart from other plaintiffs whose hardship was found to be sufficiently severe to militate against dismissal.  *See Wiwa*, 226 F. 3d at 105-07 (Nigerian refugee plaintiffs seeking damages from human rights violations under the Alien Tort Claims Act); *Guidi v. Inter-Continental Hotels Corp.*, 224 F. 3d 142, 147 (2d Cir. 2000) (Holding that forcing plaintiffs, who were widows or victims of killings in Egypt targeting foreigners, to litigate in Egypt "presents an obvious and significant inconvenience, especially considering their adverse experience with that country to date.  This is not a case where the plaintiff is a corporation doing business abroad and can expect to litigate in foreign courts.").  The court also notes that "[t]he fact that defendants are corporations does not automatically mean that they should bear the significant costs of transporting every document, every piece of physical evidence . . . and every witness relevant to the factual issues in dispute in this case." *Reers*, 320 F. Supp. 2d at 162.

Accordingly, while RJJ's asserted financial hardship is entitled to some weight, it is relatively minimal compared with the much greater burden of obtaining evidence and witnesses in this district.  Thus, the private interest factors provide considerable support for dismissal.

**V.      Dismissal Warranted Based Upon Balancing the Relevant Factors**

After balancing all of the relevant factors, including giving RJJ's choice if its home forum considerable deference, the court finds that dismissal is appropriate.  Proceeding in

England would be far more convenient than litigating in this district. This case arises out of a European investment and European business transactions under English law, which are only fortuitously connected to the United States through RJJ. All of the relevant events relating to the Offer/Solicitation and Extraordinary Resolution took place in England or Ireland, and thus most or all of the pertinent evidence and witnesses will be located in those countries. These circumstances are sufficient to overcome the weight afforded RJJ's choice of forum. To hold otherwise, where all of the factors except RJJ's choice of this district weigh heavily in favor of litigating the dispute in an alternate forum, inappropriately would give RJJ's choice of forum dispositive weight. *See Iragorri*, 274 F. 3d at 71 ("dismissal should not be automatically barred when a plaintiff has filed suit in his home forum." (quoting *Piper Aircraft Co.*, 454 U.S. at 256 n.23)). Therefore, in the court's discretion, it finds that this action should be dismissed.

## VI.   Waiver

RJJ asserts that, notwithstanding the traditional *forum non conveniens* factors, AIB's motion should be denied because the motion is barred by Section 18.2 of the Trust Deed for the Notes. (*See* RJJ Opp'n 11-12.) AIB asserts that Section 18.2 is a permissive forum selection clause that does nothing to preclude its motion. (*See* Reply Mem. of Law in Further Supp. of Def.'s Mot. to Dismiss Pl.'s Compl., Dkt. Entry 15, at 8-9.)

Section 18.2 of the Trust Deed provides:

The courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this Trust Deed, the Notes, the Receipts, the Coupons or the Talons and accordingly any legal action or proceedings arising out of or in connection with this Trust Deed, the Notes, the Receipts, the Coupons or the Talons ("Proceedings") may be brought in such courts. AIB irrevocably submits to the jurisdiction of such courts and waives any objection to Proceedings in such courts on the ground of venue or on the ground that the Proceedings have been brought in an inconvenient forum. This submission is made for the benefit of each of the Noteholders and the holders of the Receipts, the Coupons and/or the Talons and shall not limit the right of any of them to take Proceedings in any

16

>other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not).

(Sheridan Decl. Ex. 7 at 28.)

RJJ contends that because AIB's consent to be sued in England "shall not limit the right of any of [the Noteholders] to take Proceedings in any other court of competent jurisdiction," AIB has waived its right to bring a *forum non conveniens* motion. (*See* RJJ Opp'n 11-12.) This contention is wholly without merit. Section 18.2 clearly is a permissive forum selection clause, and the quoted language merely emphasizes that AIB's submission to jurisdiction in England does not, in and of itself, bar Noteholders from bringing claims in other jurisdictions. Section 18.2 does nothing to waive *other* defenses it may have against claims brought in other jurisdictions, including on *forum non conveniens* grounds. In addition, by granting AIB's motion, this court is not holding that Section 18.2 prevented RJJ from bringing its claims in the United States. Instead, the court holds that the *forum non conveniens* analysis demonstrates that England is a significantly superior venue to hear this dispute, and that under Section 18.2 England is available for the parties to litigate this dispute, satisfying one of the *forum non conveniens* factors. *See Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F. 3d 696 (2d Cir. 2009) ("[W]here parties contract to a so-called permissive forum selection clause, . . . the traditional *forum non conveniens* standards articulated by the Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947), apply."). Thus, Section 18.2 of the Trust Deed does not bar AIB's motion to dismiss.

## CONCLUSION

For the foregoing reasons, AIB's motion to dismiss on *forum non conveniens* grounds is granted.  However, the court's dismissal is conditioned upon AIB filing, NO LATER THAN SEPTEMBER 4, 2012, a document representing that it will not assert or rely upon an untimeliness defense to the claims raised in RJJ's Complaint in any action in England, or in any other jurisdiction, due to the passage of time from the date of commencement of this action up to and including September 5, 2012.


SO ORDERED.

Dated:  Brooklyn, New York
       August 27, 2012

                                           _____/s/_____
                                                DORA L. IRIZARRY
                                            United States District Judge